```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SIOBHAN MORROW, et al.,

            Plaintiffs,

        v.                              16 CV 3340 (JPO)

ANN INC., A DELEWARE
CORPORATION,

            Defendant.
------------------------------x
                                        New York, N.Y.
                                        April 19, 2018
                                        3:10 p.m.
Before:

                    HON. J. PAUL OETKEN,

                                        District Judge

                         APPEARANCES

SCOTT & SCOTT, L.L.P. (NYC)
     Attorneys for Plaintiffs
BY:  JOSEPH P. GUGLIELMO
     CAREY ALEXANDER

MORGAN, LEWIS & BOCKIUS LLP
     Attorneys for Defendant
BY:  GREGORY T. PARKS
     KRISTIN M. HADGIS
     REGINA SCHAFFER-GOLDMANN

ALSO PRESENT:  TODD CARPENTER
```

1                (Case called)

2                THE DEPUTY CLERK:  Starting with the plaintiff,
3       counsel please state your name for the record.

4                MR. GUGLIELMO:  Good afternoon, your Honor.  My name
5       is Joseph Guglielmo.  I'm with the law firm of Scott & Scott.
6       I'm here with my colleague, Carey Alexander, who is also with
7       Scott & Scott.

8                MR. CARPENTER:  Good afternoon, your Honor.  Todd
9       Carpenter with the law firm of Carlson Lynch Sweet Kilpela &
10      Carpenter.

11               THE COURT:  Good afternoon.

12               MR. PARKS:  Good afternoon, your Honor.  Greg Parks
13      with Morgan, Lewis & Bockius on behalf of Defendant Ann Inc.
14      I'll allow my colleagues to introduce themselves.

15               THE COURT:  Good afternoon.

16               MS. HADGIS:  Good afternoon, your Honor.  Kristin
17      Hadgis of Morgan, Lewis & Bockius for Defendant Ann Inc.

18               THE COURT:  Good afternoon.

19               MS. SCHAFFER-GOLDMAN:  Good afternoon, your Honor.
20      Regina Schaffer-Goldman, also with Morgan, Lewis, also for
21      Defendant Ann Inc.

22               THE COURT:  Good afternoon, everyone.  We're here for
23      a settlement hearing, a fairness hearing in this matter.  I've
24      granted preliminary approval of the proposed settlement on
25      December 4, 2017.  I've received documentation describing the

1  settlement, seeking approval of the settlement and approval of
2  the fee award requested by plaintiffs.
3         As I understand it, the settlement fund is valued at
4  $6.1 million.  It includes the option of a $5 cash payment or
5  $12 voucher, certain changes in practices by defendant, and
6  $1,500 in cash, I believe, for each of the two plaintiffs as
7  service awards and a request for attorneys' fees and costs.
8         I'll ask counsel for plaintiff.  Who is going to
9  speak, Mr. Guglielmo?
10         MR. GUGLIELMO:  Your Honor, I was going to handle the
11  arguments and objectors relating to the fee, and I was going to
12  let my colleague, Mr. Alexander, handle the fairness of the
13  settlement.
14         THE COURT:  Okay.  Great.
15         Mr. Alexander, could you just describe generally first
16  the notice that went out and how the settlement will work.
17         MR. ALEXANDER:  Yes.  Absolutely, Your Honor.  As to
18  the notice plan, it was executed in the form and manner that
19  was described in the declaration Carla Peak of KCC that was
20  approved as part of the preliminary approval order.
21         The notice plan had two main components.  First there
22  was direct individual email and postcards notice to individuals
23  who were identified in Ann's business records.  Second, there
24  was indirect notice that was also provided through the
25  settlement website.

1          KCC had sent out 5.4 million emails to class members
2   who were identified in Ann's business records and also sent out
3   one million postcards.  As of the beginning of this week, the
4   settlement website has received almost 770,000 hits.
5          The settlement as a whole, as Your Honor has
6   recognized, provides the cash relief that is presumptively
7   valued at $5 subject to a pro rata increase as allowed in the
8   fund, and the vouchers are presumptively valued at $12.  If
9   there are additional vouchers that are in the fund, the number
10  of vouchers that each plaintiff can receive will be increased
11  until the fund is exhausted.
12         THE COURT:  So you can get up to two vouchers?  Or can
13  you get more than that.
14         MR. ALEXANDER:  You can get more than that.  If the
15  distribution occurred today, plaintiffs electing to receive
16  vouchers would receive either five vouchers, or some would
17  receive six vouchers as well for a total recovery worth either
18  $60 or $72.  So in any single transaction, plaintiffs can use
19  two vouchers at a time to purchase $24 worth of merchandise.
20         THE COURT:  What about the cash payment?  Is there a
21  limit for each class member for the cash payment?
22         MR. ALEXANDER:  It would be a one-time payment subject
23  to pro rata adjustment as necessary.  If the distributions were
24  made today, we believe there is approximately $3.89 left.  So
25  each individual who elected to receive cash would receive a

1    payment of $8.89.

2             THE COURT:  What's the total amount of cash being paid
3    by defendant?

4             MR. ALEXANDER:  It's $1,000,000 -- $500,000 into the
5    notice fund, $500 into the cash fund separate and apart from
6    fees, expense, and awards.

7             THE COURT:  So it's a total of $1,000,000 by
8    defendant.

9             MR. ALEXANDER:  Yes.

10            THE COURT:  For everything.

11            MR. ALEXANDER:  In terms of benefits made available to
12   the class, yes, from Ann's part of the settlement.

13            THE COURT:  And then the fee award is on top of that?

14            MR. ALEXANDER:  Yes.  Separate and apart.

15            THE COURT:  Okay.  I think that answers my question.
16       Are you going to talk about objections and opt-outs?

17            MR. ALEXANDER:  I'm happy to talk about the procedural
18   substantive considerations to the objectors as relates to the
19   motion for final approval.

20            THE COURT:  I had seen three objections -- one by
21   Paula Leach, L-e-a-c-h; one by Pamela Sweeney, and one by Becky
22   Morrow.  I assume no relation to the plaintiff Morrow.

23            MR. ALEXANDER:  No.

24            THE COURT:  Those are the objections.  Are there any
25   other objections?

1             MR. ALEXANDER:  Not that we're aware of.

2             THE COURT:  Is there anyone here who is an objector?

3             MR. PARKS:  No, your Honor.

4             THE COURT:  How many opt-outs?

5             MR. ALEXANDER:  There are 63 individuals who requested
6     exclusion.

7             THE COURT:  I'll give you a chance to respond to
8     anything raised by the objectors.

9             MR. ALEXANDER:  Unless your Honor has any specific
10    questions, we're comfortable with the arguments that we made in
11    the papers.  We generally believe that Ms. Leach's arguments
12    actually argued in favor of granting settlement and finding
13    substantive fairness, and we otherwise don't believe that the
14    objections do have merit.

15            Again, as to Ms. Morrow's objections, they were
16    concerned partly that there would be insufficient funds in the
17    cash portion, the portion to all the class members, and the
18    data is showing right now that that is not the case at all.

19            We similarly believe she had also addressed the
20    propriety of the class certification.  She invoked the Ninth
21    Circuit panel decision in *Hyundai*.  We don't believe that's the
22    law in the Second Circuit here.  We don't believe that it's
23    necessary to do a choice of law analysis.  No party
24    defendants -- not Ms. Morrow, not any of the other objectors --
25    have identified any other law that potentially conflicts.  So

1   we believe that New York law applies here.

2           THE COURT:  Thank you.

3           MR. ALEXANDER:  Thank you.

4           THE COURT:  Do you want to address the attorneys' fee
5   request?

6           MR. GUGLIELMO:  Yes, your Honor.  Thank you.  This is
7   Joseph Guglielmo with Scott & Scott.

8           Your Honor, as we set forth in our papers, we're
9   seeking an award of $1.525 million.  That includes the expenses
10  that we were seeking of approximately $18,900.  And we've set
11  forth in the declarations of Daryl Scott and Gary Lynch the
12  breakout of the attorneys and para professionals that have
13  worked on this litigation.

14          Your Honor, we believe that the attorneys' fee is well
15  within the range of the applicable Second Circuit benchmark of
16  25 percent.  When you look at the total amount available to
17  class members, the $6.1 million, we believe that the $1.525
18  million fee and expense request is approximately 25 percent of
19  that.

20          We know that courts within this district will also
21  sometimes include the fees as part of the percentage of the
22  recovery approach.  And if you were to take that approach, your
23  Honor, the fee is actually 20 percent of the total amount made
24  available.

25          Your Honor, in looking at the fee itself, in doing a

Lodestar crosscheck, we believe that that further supports approval of the requested fee. It's approximately 1.7 to 1.8 of the Lodestar submitted, your Honor.

THE COURT: So the Lodestar total plus expenses is how much?

MR. GUGLIELMO: The Lodestar total plus expenses I believe is $890,000, your Honor. So it would be proximately 1.70 something. I've forgotten the decimal. But it's about 1.7 and change.

If you look at that, your Honor, the cases that we cited, both in our opening brief and in our reply, set forth that in this district and in this circuit, multipliers from 2 to upwards of 6 have been awarded in cases.

In looking at the various Goldberger factors, we believed that there was substantial risk at the time we brought the case. We've expended tremendous amount of time and resources. Your Honor, we did a very, very detailed factual investigation before we filed this complaint.

We went around looking at the various stores where Ann Taylor Loft and factory outlet merchandise was sold to determine the scope and extent of the pricing scheme that we alleged.

We looked at it over time, we studied it, and we were able to develop the claims here to support our allegations and demonstrate that the practices here that we believe we've

1  alleged, that Ann was engaged in a deceptive pricing scheme by
2  having certain of their products constantly offered for sale,
3  as well as advertising certain goods as being from an Ann
4  Taylor mainline store when it was from an Ann Taylor Outlet or
5  factory store.
6        One of the other things, your Honor, is in looking at
7  the fee award, not only the cash component but the injunctive
8  relief, as you noted in the beginning -- we believe it's very
9  significant.  Although we didn't value it, it's a factor to
10  consider in awarding the fee.
11        In looking at the injunctive relief, we believe we've
12  gone right to the heart of the underlying claim.  Ann has
13  agreed to change the labels, the price tags, associated with
14  the goods that they offer at the factory and outlet stores.  So
15  there is not going to be any confusion.
16        Additionally, they've agreed to comply with the law
17  regarding pricing.  So, in other words, the FTC provisions and
18  the California provisions we set forth in our complaint
19  regarding how pricing is to occur -- they've agreed to comply
20  with those particular provisions, your Honor.  So we believe
21  that the perspective and injunctive has tremendous value and
22  further supports the fee.
23        If you'd like, your Honor, I can just briefly touch
24  upon the arguments raised by the objectors against the fee.
25        THE COURT:  Yes.  The one I'd like to focus on is I

haven't really dealt with coupon settlements before, and this is one that has both a coupon piece and a cash piece obviously. Coupon settlements are sometimes scrutinized closely by judges on the theory that it's a benefit to the defendant often as much as it's a benefit to the plaintiffs in the case, and my main question about that is how to value that in terms of the Lodestar.  Is the $6.1 million figure the right figure as the denominator for purposes of thinking about the multiplier.

MR. GUGLIELMO:  Your Honor, the first part of the answer is these are not coupons.  They're vouchers.  There's a difference.  The material differences here -- what CAFA had looked at and what the cases criticize in coupons that the objectors cite to are cases where you have to come out of pocket, in other words, 30 percent off, the coupons you get in a circular -- that's a coupon.  That's what CAFA warns against because a class member then would have to go back to an entity that allegedly committed a wrongdoing and purchase.

Here these are vouchers.  No class member has to come out of pocket.  In connection with our due diligence and in connection with the negotiations, we looked at the prices that the Ann Taylor Loft and the Ann Taylor outlet stores charged, and we were able to, through confirmatory discovery, identify numerous products, hundreds of products, that were sold below the $12 point of the voucher.  So class members have the opportunity to obtain merchandise if they so choose without

1  going out of pocket. So that's why it's not a coupon. It's a
2  voucher.
3         THE COURT: I'm confused. The difference is they can
4  buy something for $12 or $24 --
5         MR. GUGLIELMO: Yes. $12 or $24 or less, and they
6  don't have to come out of pocket. Coupons are basically you
7  have to pay cash to get something. So the cases that are cited
8  by the objectors are cases where someone gets 30 percent off an
9  additional product. So, in other words, you had to buy $12,
10 and you get $4 back. So you have to come out of pocket.
11        THE COURT: In this case there aren't many things you
12 can buy for $12, are there?
13        MR. GUGLIELMO: There are hundreds, your Honor. We
14 did the due diligence in connection with the settlement.
15 In fact, if you look at the allegations in the complaint, our
16 clients purchased -- out of the five items that were purchased,
17 three of them were purchased for under $12.
18        So there are a number of accessories. There are tops.
19 There are sweaters. There were hosiery. There were a number
20 of garments. We did this in connection with our confirmatory
21 discovery. We went out and went to the stores. We didn't just
22 trust what Ann told us, and Ann provided us numerous skews,
23 hundreds of skews, your Honor, where products were being
24 offered.
25        The other thing that you can look at which basically

differentiates the case -- again, this is why the objectors' arguments fall apart. They base the argument on this being solely a coupon settlement. Even if it were a coupon settlement, your Honor, which we do not believe it is, a separate fund was created here.

In the *Blessing v. Sirius XM* case, your Honor, the Second Circuit, basically the critical part is no part of plaintiffs' fee application is attributable to an award of coupons. It's a separately negotiated fee. So that's another reason why the argument falls apart.

The third argument, your Honor -- and this is something that was cited in another deceptive pricing case in California was where there is an option to receive cash in lieu of the voucher. And that's exactly what we've offered here, your Honor.

So we believe these are not coupons. The reason why is they're fully transferable. They are stackable. They can be used to purchase a garment in full. We believe those factors set apart, your Honor, the case law that talks about coupons. We don't believe this is a coupon settlement.

In addition to that, as I said, we negotiated the fee separately. So that, again, will set it aside under Second Circuit law.

THE COURT: Are there circumstances under which there is a reversion back to the defendant of any of the money?

1    MR. GUGLIELMO:  None of the cash reverts, your Honor.
2    No.  The million dollars at issue does not revert.  The
3    $500,000 fund and the monies towards the notice and
4    administration do not revert.
5            THE COURT:  Okay.
6            MR. GUGLIELMO:  Your Honor, if you'd like, I can
7    address briefly the remaining arguments.  Again, most of the
8    arguments fall apart because they base their arguments on the
9    fact that either this is a coupon settlement, which it's not,
10   or they basically hypothesize about the fact -- and I think
11   they misconstrue what the settlement really is.
12           Ms. Sweeney actually states in her objection that she
13   doesn't think that these vouchers have real value or full
14   value.  She doesn't explain what that means.  They have real
15   value.
16           As I said, a class member can go to the store, once
17   they receive these vouchers, and purchase $12 or $24 of
18   merchandise, walk out of the store, and not come out of pocket.
19   So they don't have some theoretical or hypothetical value.
20   They have actual value.  That is why, again, this is not a
21   coupon settlement, and that argument should be just dismissed.
22           The last argument I'll just raise briefly is
23   Ms. Morrow attacks the multiplier, 1.7.  Your Honor, again, I
24   think that the cases we've set forth in our papers show that
25   the multiplier is well within the range of reasonableness in

1    the Second Circuit and in this district.  I think the *CVS* case
2    recently awarded a 6 multiplier.
3            Your Honor, if I can just briefly turn to the
4    incentive awards, if that's okay.
5            THE COURT:  Sure.
6            MR. GUGLIELMO:  Your Honor, we're asking for modest
7    incentive awards of $1,500 to both Ms. Morrow and Ms. Gennock.
8    They provided valuable assistance in this case.  They were
9    active participants, not only in the development of the facts,
10   but they participated throughout the process of the case.
11           They provided documents.  They engaged in discovery in
12   providing this information for our initial disclosures.  They
13   participated in mediation.  They came here, and they sat with
14   us with Magistrate Judge Netburn and provided valuable insight
15   as the class members in terms of their experiences with the Ann
16   Taylor Loft and factory stores.  They confirmed the facts
17   underlying the claims, and then they assisted us in essentially
18   putting together the voucher amounts that we negotiated with
19   opposing counsel.
20           We believe that the amounts at issue, the $1,500 each,
21   are well within amounts that have been approved, your Honor,
22   not only in this district but throughout other retail deceptive
23   pricing cases, and we respectfully request that that be
24   approved.
25           THE COURT:  Thank you.

             Counsel for defendant, Mr. Parks, you probably aren't
going to have much to say.

             MR. PARKS:  That's correct.

             THE COURT:  Other than opposing the fee award.

             MR. PARKS:  That's correct.  We do support the
approval of the class.  We do believe that it's fair,
reasonable, and adequate.  I can certify to the Court that this
settlement was negotiated at arm's length between competent
counsel under the supervision of Magistrate Judge Netburn who
was good enough to spend an entire day with us and then also
follow up with us a few times on the phone in order to get this
done because it was very adversarial, but we did manage to get
it done.

             As both parties cited in their papers, under the
*Wal-Mart v. Visa*, a Second Circuit case, there is a presumption
of validity that arises when the Court makes a finding that
there was arm's length negotiation among competent counsel.

             The second thing I did want to say is I agree with
Mr. Guglielmo that this is not a coupon settlement.  Coupons
certainly is that scenario in which what the retailer sends out
is $10 off of a minium $50 purchase or 20 percent off.

             In that instance, the class member comes in, and they
have to spend $40 of their own money in order to get something.
Here they have a $12 voucher that they can use to buy hundreds
of products or they can use to buy a product that costs maybe

1  just a little bit more than the $12 or the $24 that they may
2  have.
3         The other thing I'd note on that point is that the
4  class members got a choice between whether they would get cash
5  or a voucher, and they got the choice between $5 in cash or a
6  $12 voucher or maybe multiple of $12 vouchers.
7         To date from the claims we've seen coming in, over
8  65 percent of the class has actually elected the voucher.  So
9  that demonstrates to the Court that the class sees real value
10 in the voucher.
11        This is a class of our customers.  Ann Taylor Loft and
12 Outlet are both very fortunate in that they have a lot of
13 returning customers.  They do have a lot of repeat customers.
14 So people who have purchased before will come and purchase
15 again.  So that's why we see that they see real value in this.
16        Of course one of the Grinnell factors that the Court
17 needs to consider in a fairness opinion is the reaction to the
18 class.  Here we can see the reaction of the class is they favor
19 the vouchers, and they see real value in the vouchers.
20        So for those reasons, I would agree that it's not a
21 coupon settlement and not subject to some of the criticisms
22 that attach to coupon settlements.  Other than that, I'm happy
23 to answer any of your Honor's questions.
24        THE COURT:  Okay.  Thank you.
25        I'm going to approve the settlement.  I find, having

1  considered in light of the Grinnell factors, that it is fair,
2  reasonable, and adequate.  I take your all's point that this is
3  different than a coupon settlement.  A voucher is different.
4  In some respects it has aspects that have been criticized like
5  a coupon, but this is different in significant ways I believe.
6  I think this is a good settlement.
7       The class members of course had the option of taking
8  cash.  And it is noteworthy, as you all have pointed out, that
9  65 percent have chosen some form of the vouchers.
10      And I will note that part of my decision in finding
11  that this is a fair and reasonable and adequate settlement is
12  the fact that there were real challenges in pursuing the case,
13  including the fact that although I denied a motion to dismiss,
14  there are probably other judges who would see it differently,
15  whether there was injury or not, including the challenges that
16  would be faced by plaintiffs going forward and proving issues
17  like damages and causation.  So I am going to approve the
18  settlement.
19      I'm going to reserve on the amount of fees.  I might
20  want to look at cases a little bit more, but I am going to
21  approve the settlement.  I'll be issuing an order shortly that
22  confirms it.
23      Anything else for today?
24      MR. PARKS:  Yes, your Honor.  I think the original
25  proposed form of order that we submitted to the Court had one

1  slight typo in it about the data that was used and the

2  information that was used, and then it also did not have a

3  finding by the Court that CAFA notice had been complied with.

4          CAFA notice has in fact been complied with.  We've

5  submitted that to the Court.  I think it would be appropriate

6  for the Court to have both of those things in a proposed final

7  order.

8          We can resubmit a proposed final order with those two

9  corrections in it, if that would be convenient to the Court, or

10 proceed however your Honor would like.

11         THE COURT:  Anything else from plaintiffs?

12         MR. GUGLIELMO:  No, your Honor.

13         THE COURT:  If you all would confer and submit an

14 agreed-upon proposed order, that would be great.

15         MR. PARKS:  Will do.

16         THE COURT:  Thank you very much.

17         (Adjourned)