UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SIOBHAN MORROW, et al.,

                  Plaintiffs,

           v.                              16 CV 3340 (JPO)

ANN INC., A DELEWARE
CORPORATION,

                  Defendant.

------------------------------x
                                      New York, N.Y.
                                      April 19, 2018
                                      3:10 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                      District Judge

                         APPEARANCES

SCOTT & SCOTT, L.L.P. (NYC)
     Attorneys for Plaintiffs
BY:  JOSEPH P. GUGLIELMO
     CAREY ALEXANDER

MORGAN, LEWIS & BOCKIUS LLP
     Attorneys for Defendant
BY:  GREGORY T. PARKS
     KRISTIN M. HADGIS
     REGINA SCHAFFER-GOLDMANN

ALSO PRESENT:  TODD CARPENTER

1          (Case called)

2          THE DEPUTY CLERK:  Starting with the plaintiff,

3   counsel please state your name for the record.

4          MR. GUGLIELMO:  Good afternoon, your Honor.  My name

5   is Joseph Guglielmo.  I'm with the law firm of Scott & Scott.

6   I'm here with my colleague, Carey Alexander, who is also with

7   Scott & Scott.

8          MR. CARPENTER:  Good afternoon, your Honor.  Todd

9   Carpenter with the law firm of Carlson Lynch Sweet Kilpela &

10  Carpenter.

11         THE COURT:  Good afternoon.

12         MR. PARKS:  Good afternoon, your Honor.  Greg Parks

13  with Morgan, Lewis & Bockius on behalf of Defendant Ann Inc.

14  I'll allow my colleagues to introduce themselves.

15         THE COURT:  Good afternoon.

16         MS. HADGIS:  Good afternoon, your Honor.  Kristin

17  Hadgis of Morgan, Lewis & Bockius for Defendant Ann Inc.

18         THE COURT:  Good afternoon.

19         MS. SCHAFFER-GOLDMAN:  Good afternoon, your Honor.

20  Regina Schaffer-Goldman, also with Morgan, Lewis, also for

21  Defendant Ann Inc.

22         THE COURT:  Good afternoon, everyone.  We're here for

23  a settlement hearing, a fairness hearing in this matter.  I've

24  granted preliminary approval of the proposed settlement on

25  December 4, 2017.  I've received documentation describing the

1     settlement, seeking approval of the settlement and approval of

2     the fee award requested by plaintiffs.

3         As I understand it, the settlement fund is valued at

4     $6.1 million.  It includes the option of a $5 cash payment or

5     $12 voucher, certain changes in practices by defendant, and

6     $1,500 in cash, I believe, for each of the two plaintiffs as

7     service awards and a request for attorneys' fees and costs.

8         I'll ask counsel for plaintiff.  Who is going to

9     speak, Mr. Guglielmo?

10        MR. GUGLIELMO:  Your Honor, I was going to handle the

11    arguments and objectors relating to the fee, and I was going to

12    let my colleague, Mr. Alexander, handle the fairness of the

13    settlement.

14        THE COURT:  Okay.  Great.

15        Mr. Alexander, could you just describe generally first

16    the notice that went out and how the settlement will work.

17        MR. ALEXANDER:  Yes.  Absolutely, Your Honor.  As to

18    the notice plan, it was executed in the form and manner that

19    was described in the declaration Carla Peak of KCC that was

20    approved as part of the preliminary approval order.

21        The notice plan had two main components.  First there

22    was direct individual email and postcards notice to individuals

23    who were identified in Ann's business records.  Second, there

24    was indirect notice that was also provided through the

25    settlement website.

1    KCC had sent out 5.4 million emails to class members

2    who were identified in Ann's business records and also sent out

3    one million postcards.  As of the beginning of this week, the

4    settlement website has received almost 770,000 hits.

5    The settlement as a whole, as Your Honor has

6    recognized, provides the cash relief that is presumptively

7    valued at $5 subject to a pro rata increase as allowed in the

8    fund, and the vouchers are presumptively valued at $12.  If

9    there are additional vouchers that are in the fund, the number

10   of vouchers that each plaintiff can receive will be increased

11   until the fund is exhausted.

12   THE COURT:  So you can get up to two vouchers?  Or can

13   you get more than that.

14   MR. ALEXANDER:  You can get more than that.  If the

15   distribution occurred today, plaintiffs electing to receive

16   vouchers would receive either five vouchers, or some would

17   receive six vouchers as well for a total recovery worth either

18   $60 or $72.  So in any single transaction, plaintiffs can use

19   two vouchers at a time to purchase $24 worth of merchandise.

20   THE COURT:  What about the cash payment?  Is there a

21   limit for each class member for the cash payment?

22   MR. ALEXANDER:  It would be a one-time payment subject

23   to pro rata adjustment as necessary.  If the distributions were

24   made today, we believe there is approximately $3.89 left.  So

25   each individual who elected to receive cash would receive a

1   payment of $8.89.

2          THE COURT:  What's the total amount of cash being paid

3   by defendant?

4          MR. ALEXANDER:  It's $1,000,000 -- $500,000 into the

5   notice fund, $500 into the cash fund separate and apart from

6   fees, expense, and awards.

7          THE COURT:  So it's a total of $1,000,000 by

8   defendant.

9          MR. ALEXANDER:  Yes.

10          THE COURT:  For everything.

11          MR. ALEXANDER:  In terms of benefits made available to

12   the class, yes, from Ann's part of the settlement.

13          THE COURT:  And then the fee award is on top of that?

14          MR. ALEXANDER:  Yes.  Separate and apart.

15          THE COURT:  Okay.  I think that answers my question.

16          Are you going to talk about objections and opt-outs?

17          MR. ALEXANDER:  I'm happy to talk about the procedural

18   substantive considerations to the objectors as relates to the

19   motion for final approval.

20          THE COURT:  I had seen three objections -- one by

21   Paula Leach, L-e-a-c-h; one by Pamela Sweeney, and one by Becky

22   Morrow.  I assume no relation to the plaintiff Morrow.

23          MR. ALEXANDER:  No.

24          THE COURT:  Those are the objections.  Are there any

25   other objections?

```
 1            MR. ALEXANDER:  Not that we're aware of.

 2            THE COURT:  Is there anyone here who is an objector?

 3            MR. PARKS:  No, your Honor.

 4            THE COURT:  How many opt-outs?

 5            MR. ALEXANDER:  There are 63 individuals who requested

 6   exclusion.

 7            THE COURT:  I'll give you a chance to respond to

 8   anything raised by the objectors.

 9            MR. ALEXANDER:  Unless your Honor has any specific

10   questions, we're comfortable with the arguments that we made in

11   the papers.  We generally believe that Ms. Leach's arguments

12   actually argued in favor of granting settlement and finding

13   substantive fairness, and we otherwise don't believe that the

14   objections do have merit.

15            Again, as to Ms. Morrow's objections, they were

16   concerned partly that there would be insufficient funds in the

17   cash portion, the portion to all the class members, and the

18   data is showing right now that that is not the case at all.

19            We similarly believe she had also addressed the

20   propriety of the class certification.  She invoked the Ninth

21   Circuit panel decision in Hyundai.  We don't believe that's the

22   law in the Second Circuit here.  We don't believe that it's

23   necessary to do a choice of law analysis.  No party

24   defendants -- not Ms. Morrow, not any of the other objectors --

25   have identified any other law that potentially conflicts.  So
```

1 we believe that New York law applies here.

2     THE COURT:  Thank you.

3     MR. ALEXANDER:  Thank you.

4     THE COURT:  Do you want to address the attorneys' fee

5 request?

6     MR. GUGLIELMO:  Yes, your Honor.  Thank you.  This is

7 Joseph Guglielmo with Scott & Scott.

8     Your Honor, as we set forth in our papers, we're

9 seeking an award of $1.525 million.  That includes the expenses

10 that we were seeking of approximately $18,900.  And we've set

11 forth in the declarations of Daryl Scott and Gary Lynch the

12 breakout of the attorneys and para professionals that have

13 worked on this litigation.

14     Your Honor, we believe that the attorneys' fee is well

15 within the range of the applicable Second Circuit benchmark of

16 25 percent.  When you look at the total amount available to

17 class members, the $6.1 million, we believe that the $1.525

18 million fee and expense request is approximately 25 percent of

19 that.

20     We know that courts within this district will also

21 sometimes include the fees as part of the percentage of the

22 recovery approach.  And if you were to take that approach, your

23 Honor, the fee is actually 20 percent of the total amount made

24 available.

25     Your Honor, in looking at the fee itself, in doing a

1    Lodestar crosscheck, we believe that that further supports

2    approval of the requested fee.  It's approximately 1.7 to 1.8

3    of the Lodestar submitted, your Honor.

4         THE COURT:  So the Lodestar total plus expenses is how

5    much?

6         MR. GUGLIELMO:  The Lodestar total plus expenses I

7    believe is $890,000, your Honor.  So it would be proximately

8    1.70 something.  I've forgotten the decimal.  But it's about

9    1.7 and change.

10        If you look at that, your Honor, the cases that we

11   cited, both in our opening brief and in our reply, set forth

12   that in this district and in this circuit, multipliers from 2

13   to upwards of 6 have been awarded in cases.

14        In looking at the various Goldberger factors, we

15   believed that there was substantial risk at the time we brought

16   the case.  We've expended tremendous amount of time and

17   resources.  Your Honor, we did a very, very detailed factual

18   investigation before we filed this complaint.

19        We went around looking at the various stores where Ann

20   Taylor Loft and factory outlet merchandise was sold to

21   determine the scope and extent of the pricing scheme that we

22   alleged.

23        We looked at it over time, we studied it, and we were

24   able to develop the claims here to support our allegations and

25   demonstrate that the practices here that we believe we've

1    alleged, that Ann was engaged in a deceptive pricing scheme by

2    having certain of their products constantly offered for sale,

3    as well as advertising certain goods as being from an Ann

4    Taylor mainline store when it was from an Ann Taylor Outlet or

5    factory store.

6            One of the other things, your Honor, is in looking at

7    the fee award, not only the cash component but the injunctive

8    relief, as you noted in the beginning -- we believe it's very

9    significant.  Although we didn't value it, it's a factor to

10   consider in awarding the fee.

11           In looking at the injunctive relief, we believe we've

12   gone right to the heart of the underlying claim.  Ann has

13   agreed to change the labels, the price tags, associated with

14   the goods that they offer at the factory and outlet stores.  So

15   there is not going to be any confusion.

16           Additionally, they've agreed to comply with the law

17   regarding pricing.  So, in other words, the FTC provisions and

18   the California provisions we set forth in our complaint

19   regarding how pricing is to occur -- they've agreed to comply

20   with those particular provisions, your Honor.  So we believe

21   that the perspective and injunctive has tremendous value and

22   further supports the fee.

23           If you'd like, your Honor, I can just briefly touch

24   upon the arguments raised by the objectors against the fee.

25           THE COURT:  Yes.  The one I'd like to focus on is I

1   haven't really dealt with coupon settlements before, and this

2   is one that has both a coupon piece and a cash piece obviously.

3   Coupon settlements are sometimes scrutinized closely by judges

4   on the theory that it's a benefit to the defendant often as

5   much as it's a benefit to the plaintiffs in the case, and my

6   main question about that is how to value that in terms of the

7   Lodestar.  Is the $6.1 million figure the right figure as the

8   denominator for purposes of thinking about the multiplier.

9        MR. GUGLIELMO:  Your Honor, the first part of the

10   answer is these are not coupons.  They're vouchers.  There's a

11   difference.  The material differences here -- what CAFA had

12   looked at and what the cases criticize in coupons that the

13   objectors cite to are cases where you have to come out of

14   pocket, in other words, 30 percent off, the coupons you get in

15   a circular -- that's a coupon.  That's what CAFA warns against

16   because a class member then would have to go back to an entity

17   that allegedly committed a wrongdoing and purchase.

18        Here these are vouchers.  No class member has to come

19   out of pocket.  In connection with our due diligence and in

20   connection with the negotiations, we looked at the prices that

21   the Ann Taylor Loft and the Ann Taylor outlet stores charged,

22   and we were able to, through confirmatory discovery, identify

23   numerous products, hundreds of products, that were sold below

24   the $12 point of the voucher.  So class members have the

25   opportunity to obtain merchandise if they so choose without

1    going out of pocket.  So that's why it's not a coupon.  It's a

2    voucher.

3            THE COURT:  I'm confused.  The difference is they can

4    buy something for $12 or $24 --

5            MR. GUGLIELMO:  Yes.  $12 or $24 or less, and they

6    don't have to come out of pocket.  Coupons are basically you

7    have to pay cash to get something.  So the cases that are cited

8    by the objectors are cases where someone gets 30 percent off an

9    additional product.  So, in other words, you had to buy $12,

10   and you get $4 back.  So you have to come out of pocket.

11           THE COURT:  In this case there aren't many things you

12   can buy for $12, are there?

13           MR. GUGLIELMO:  There are hundreds, your Honor.  We

14   did the due diligence in connection with the settlement.

15   In fact, if you look at the allegations in the complaint, our

16   clients purchased -- out of the five items that were purchased,

17   three of them were purchased for under $12.

18           So there are a number of accessories.  There are tops.

19   There are sweaters.  There were hosiery.  There were a number

20   of garments.  We did this in connection with our confirmatory

21   discovery.  We went out and went to the stores.  We didn't just

22   trust what Ann told us, and Ann provided us numerous skews,

23   hundreds of skews, your Honor, where products were being

24   offered.

25           The other thing that you can look at which basically

 1   differentiates the case -- again, this is why the objectors'

 2   arguments fall apart.  They base the argument on this being

 3   solely a coupon settlement.  Even if it were a coupon

 4   settlement, your Honor, which we do not believe it is, a

 5   separate fund was created here.

 6          In the *Blessing v. Sirius XM* case, your Honor, the

 7   Second Circuit, basically the critical part is no part of

 8   plaintiffs' fee application is attributable to an award of

 9   coupons.  It's a separately negotiated fee.  So that's another

10   reason why the argument falls apart.

11          The third argument, your Honor -- and this is

12   something that was cited in another deceptive pricing case in

13   California was where there is an option to receive cash in lieu

14   of the voucher.  And that's exactly what we've offered here,

15   your Honor.

16          So we believe these are not coupons.  The reason why

17   is they're fully transferable.  They are stackable.  They can

18   be used to purchase a garment in full.  We believe those

19   factors set apart, your Honor, the case law that talks about

20   coupons.  We don't believe this is a coupon settlement.

21          In addition to that, as I said, we negotiated the fee

22   separately.  So that, again, will set it aside under Second

23   Circuit law.

24          THE COURT:  Are there circumstances under which there

25   is a reversion back to the defendant of any of the money?

1              MR. GUGLIELMO:  None of the cash reverts, your Honor.

2     No.  The million dollars at issue does not revert.  The

3     $500,000 fund and the monies towards the notice and

4     administration do not revert.

5              THE COURT:  Okay.

6              MR. GUGLIELMO:  Your Honor, if you'd like, I can

7     address briefly the remaining arguments.  Again, most of the

8     arguments fall apart because they base their arguments on the

9     fact that either this is a coupon settlement, which it's not,

10    or they basically hypothesize about the fact -- and I think

11    they misconstrue what the settlement really is.

12             Ms. Sweeney actually states in her objection that she

13    doesn't think that these vouchers have real value or full

14    value.  She doesn't explain what that means.  They have real

15    value.

16             As I said, a class member can go to the store, once

17    they receive these vouchers, and purchase $12 or $24 of

18    merchandise, walk out of the store, and not come out of pocket.

19    So they don't have some theoretical or hypothetical value.

20    They have actual value.  That is why, again, this is not a

21    coupon settlement, and that argument should be just dismissed.

22             The last argument I'll just raise briefly is

23    Ms. Morrow attacks the multiplier, 1.7.  Your Honor, again, I

24    think that the cases we've set forth in our papers show that

25    the multiplier is well within the range of reasonableness in

1    the Second Circuit and in this district.  I think the *CVS* case

2    recently awarded a 6 multiplier.

3           Your Honor, if I can just briefly turn to the

4    incentive awards, if that's okay.

5           THE COURT:  Sure.

6           MR. GUGLIELMO:  Your Honor, we're asking for modest

7    incentive awards of $1,500 to both Ms. Morrow and Ms. Gennock.

8    They provided valuable assistance in this case.  They were

9    active participants, not only in the development of the facts,

10   but they participated throughout the process of the case.

11          They provided documents.  They engaged in discovery in

12   providing this information for our initial disclosures.  They

13   participated in mediation.  They came here, and they sat with

14   us with Magistrate Judge Netburn and provided valuable insight

15   as the class members in terms of their experiences with the Ann

16   Taylor Loft and factory stores.  They confirmed the facts

17   underlying the claims, and then they assisted us in essentially

18   putting together the voucher amounts that we negotiated with

19   opposing counsel.

20          We believe that the amounts at issue, the $1,500 each,

21   are well within amounts that have been approved, your Honor,

22   not only in this district but throughout other retail deceptive

23   pricing cases, and we respectfully request that that be

24   approved.

25          THE COURT:  Thank you.

 1              Counsel for defendant, Mr. Parks, you probably aren't
 2     going to have much to say.
 3              MR. PARKS:  That's correct.
 4              THE COURT:  Other than opposing the fee award.
 5              MR. PARKS:  That's correct.  We do support the
 6     approval of the class.  We do believe that it's fair,
 7     reasonable, and adequate.  I can certify to the Court that this
 8     settlement was negotiated at arm's length between competent
 9     counsel under the supervision of Magistrate Judge Netburn who
10     was good enough to spend an entire day with us and then also
11     follow up with us a few times on the phone in order to get this
12     done because it was very adversarial, but we did manage to get
13     it done.
14              As both parties cited in their papers, under the
15     *Wal-Mart v. Visa*, a Second Circuit case, there is a presumption
16     of validity that arises when the Court makes a finding that
17     there was arm's length negotiation among competent counsel.
18              The second thing I did want to say is I agree with
19     Mr. Guglielmo that this is not a coupon settlement.  Coupons
20     certainly is that scenario in which what the retailer sends out
21     is $10 off of a minium $50 purchase or 20 percent off.
22              In that instance, the class member comes in, and they
23     have to spend $40 of their own money in order to get something.
24     Here they have a $12 voucher that they can use to buy hundreds
25     of products or they can use to buy a product that costs maybe

1   just a little bit more than the $12 or the $24 that they may

2   have.

3           The other thing I'd note on that point is that the

4   class members got a choice between whether they would get cash

5   or a voucher, and they got the choice between $5 in cash or a

6   $12 voucher or maybe multiple of $12 vouchers.

7           To date from the claims we've seen coming in, over

8   65 percent of the class has actually elected the voucher.  So

9   that demonstrates to the Court that the class sees real value

10  in the voucher.

11          This is a class of our customers.  Ann Taylor Loft and

12  Outlet are both very fortunate in that they have a lot of

13  returning customers.  They do have a lot of repeat customers.

14  So people who have purchased before will come and purchase

15  again.  So that's why we see that they see real value in this.

16          Of course one of the Grinnell factors that the Court

17  needs to consider in a fairness opinion is the reaction to the

18  class.  Here we can see the reaction of the class is they favor

19  the vouchers, and they see real value in the vouchers.

20          So for those reasons, I would agree that it's not a

21  coupon settlement and not subject to some of the criticisms

22  that attach to coupon settlements.  Other than that, I'm happy

23  to answer any of your Honor's questions.

24          THE COURT:  Okay.  Thank you.

25          I'm going to approve the settlement.  I find, having

1    considered in light of the Grinnell factors, that it is fair,

2    reasonable, and adequate.  I take your all's point that this is

3    different than a coupon settlement.  A voucher is different.

4    In some respects it has aspects that have been criticized like

5    a coupon, but this is different in significant ways I believe.

6    I think this is a good settlement.

7            The class members of course had the option of taking

8    cash.  And it is noteworthy, as you all have pointed out, that

9    65 percent have chosen some form of the vouchers.

10           And I will note that part of my decision in finding

11   that this is a fair and reasonable and adequate settlement is

12   the fact that there were real challenges in pursuing the case,

13   including the fact that although I denied a motion to dismiss,

14   there are probably other judges who would see it differently,

15   whether there was injury or not, including the challenges that

16   would be faced by plaintiffs going forward and proving issues

17   like damages and causation.  So I am going to approve the

18   settlement.

19           I'm going to reserve on the amount of fees.  I might

20   want to look at cases a little bit more, but I am going to

21   approve the settlement.  I'll be issuing an order shortly that

22   confirms it.

23           Anything else for today?

24           MR. PARKS:  Yes, your Honor.  I think the original

25   proposed form of order that we submitted to the Court had one

1    slight typo in it about the data that was used and the

2    information that was used, and then it also did not have a

3    finding by the Court that CAFA notice had been complied with.

4            CAFA notice has in fact been complied with.  We've

5    submitted that to the Court.  I think it would be appropriate

6    for the Court to have both of those things in a proposed final

7    order.

8            We can resubmit a proposed final order with those two

9    corrections in it, if that would be convenient to the Court, or

10   proceed however your Honor would like.

11           THE COURT:  Anything else from plaintiffs?

12           MR. GUGLIELMO:  No, your Honor.

13           THE COURT:  If you all would confer and submit an

14   agreed-upon proposed order, that would be great.

15           MR. PARKS:  Will do.

16           THE COURT:  Thank you very much.

17           (Adjourned)

18

19

20

21

22

23

24

25